**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**EASTERN DIVISION**

| | |
|---|---|
| **PATRICIA HARLOW,** ) | |
| ) | |
| Plaintiff, ) | Case No. EDCV 08-00151 AJW |
| ) | |
| v. ) | MEMORANDUM OF DECISION |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of the Social** ) | |
| **Security Administration,** ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

Plaintiff filed this action seeking reversal of the decision of defendant, the Commissioner of the Social Security Administration (the "Commissioner"), denying her application for disability insurance benefits. The parties have filed a Joint Stipulation ("JS") setting forth their contentions with respect to each disputed issue.

**Administrative Proceedings**

The parties are familiar with the procedural history of this case, which is summarized in the Joint Stipulation. [See JS 2]. In a written hearing decision that constitutes the final decision of the Commissioner, an administrative law judge ("ALJ") found that plaintiff had severe impairments consisting of "obesity, a history of multi-system symptoms blamed on fibroymyalgia/chronic fatigue syndrome, depressive disorder, and dependent personality disorder." [Administrative Record ("AR") 14]. The ALJ found that through December 31, 2003, the date her insured status expired, plaintiff retained the residual functional capacity

1  ("RFC") to perform

2  > light work except she was limited to standing and/or walking for 2 hours and sitting for 6
3  > hours in an 8-hour workday. the claimant was able to occasionally stoop and bend. She was
4  > able to climb stairs but she was precluded from climbing ladders, balancing, or working at
5  > heights. due to the effects from medication, the claimant was limited to simple, repetitive
6  > tasks.

7  [AR 15]. The ALJ further found that plaintiff's RFC precluded performance of her past relevant work but
8  did not prevent her from performing jobs available in significant numbers in the national economy.
9  Accordingly, the ALJ concluded that plaintiff was not disabled at through her date last insured. [JS 2; AR
10 21-22].

### Standard of Review

12 The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial
13 evidence or is based on legal error. Stout v. Comm'r Social Sec. Admin., 454 F.3d 1050, 1054 (9th Cir.
14 2006); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). "Substantial evidence" means "more than
15 a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir.
16 2005). "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
17 Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)(internal quotation marks omitted). The court is
18 required to review the record as a whole and to consider evidence detracting from the decision as well as
19 evidence supporting the decision. Robbins v. Soc. Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006);
20 Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999). "Where the evidence is susceptible to more than
21 one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."
22 Thomas, 278 F.3d at 954 (citing Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir.1999)).

### Discussion

24 **Development of the record**

25 Plaintiff contends that the ALJ inadequately developed the record by "merely allud[ing]" to the
26 results of psychological tests administered by plaintiff's treating psychiatrist, and by not taking steps to
27 augment the record in light of his observation that "there were no interpretations of the test information"
28 in the record. [See JS 3-9].

1  The ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's
2 interests are considered," even where, as here, "the claimant is represented by counsel." Celaya v. Halter,
3 332 F.3d 1177, 1183 (9th Cir. 2003)(quoting Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983)); see
4 Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996).  A claimant, however, retains the burden of proving
5 that he is disabled. Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001). The ALJ's "duty to develop the
6 record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow
7 for proper evaluation of the evidence." Mayes, 276 F.3d at 459-460 (rejecting the argument that the ALJ
8 breached his duty to develop the record as an impermissible attempt to shift the burden of proving disability
9 away from the claimant).

10  Dr. Kohut was plaintiff's treating psychiatrist from July 1998 through the date of the supplemental
11 hearing in September 2007. [AR 387-394, 412-420, 427-509]. His diagnoses were major depressive
12 disorder, recurrent, and dependent personality disorder. Prior to December 31, 2003, he prescribed mainly
13 the anti-depressant Wellbutrin SR; Effexor, Buspar, and Topamax were tried and discontinued. [AR 19,
14 176, 390, 465-468, 542-546]. Documents in the record indicate that Dr. Kohut or his staff administered the
15 following psychological tests to plaintiff: (1) the Minnesota Multiphasic Personality Inventory-2 ("MMPI-
16 2") in May 2000 and February 2003 [AR 447-448, 456-457]; (2) the Beck Depression Inventory ("BDI")
17 in July 1998, May 2000, and February 2003 [AR 449, 455, 458]; (3) the Social Phobia Inventory ("SPIN")
18 in May 2000 and February 2003 [AR 450, 459]; and (4) the Yale-Brown Obsessive Compulsive Scale
19 Symptom Checklist and Severity Ratings scale ("Y-BOCS") in May 2000 and February 2003. [AR 451-
20 454, 460-463].

21  Plaintiff's scores and ratings on some of those tests are noted on the test documents.  She had a BDI
22 score of 29, indicating moderate depression, in July 1998. [AR 455]. Her May 2000 BDI score was 25, also
23 indicative of moderate depression.  Plaintiff's May 2003 BDI score was 30, indicating severe depression.
24 [AR 440, 449, 455, 458]. Plaintiff's May 2000 and February 2003 SPIN scores of 16 and 27 were indicative
25 of mild social phobia. [AR 456, 447, 450]. Plaintiff's May 2000 and February 2003 Y-BOCS total scores
26 of 14 and 10, respectively, were within the range connoting mild obsessive-compulsive disorder. [AR 451-
27 452, 462-463].  The record does not contain any interpretation of plaintiff's MMPI-2 scores.
28  The first hearing in this case was conducted on June 27, 2007.  [AR 513-527].  After hearing

1  testimony from a medical expert, the ALJ asked plaintiff's counsel whether all of plaintiff's psychiatric
2  treatment records had been submitted. [AR 525]. Counsel indicated that he was still trying to obtain some
3  treatment records. [AR 525-526]. The ALJ offered to issue a subpoena if counsel wished. [AR 526]. The
4  ALJ also said that he thought it would be helpful to augment the record with a clinical psychologist's expert
5  testimony. Counsel agreed. The ALJ proposed scheduling a supplemental hearing in about a month's time,
6  adding, "That'll give you more time to get the records. If, if you need my assistance with the subpoena, let
7  me know." Counsel agreed. [AR 526].

8  Dr. Kania, a psychological expert, testified during the supplemental hearing in September 2007. He
9  noted that the BDI is a self-reported test, and that there was no interpretation of the MMPI-2 results in the
10 record. Dr. Kania said that he had not interpreted the psychological test results, but that he assumed that
11 Dr. Kohut took those results into account when prescribing medication to plaintiff. [AR 541]. Dr. Kania
12 testified that he did not agree with Dr. Kohut's assessment on a May 2007 mental functional capacities form,
13 in which he indicated that plaintiff had marked to extreme mental functional limitations in all areas rated.
14 [AR 413-414]. Dr. Kania testified that based on his review of plaintiff's treatment records, she had a
15 depressive disorder and dependent personality disorder resulting in mild restrictions in activities of daily
16 living, maintaining social functioning, and maintaining concentration, persistence, and pace, and no repeated
17 episodes of decompensation. [AR 536-538].

18  In her reply, plaintiff argues that
19  [if] the ALJ had any questions about these tests, he should have, at a minimum, submitted
20  questions or requested additional medical records, subpoenaed the plaintiff's treating and
21  examining physicians, continued the hearing, or kept the record open after the hearing to
22  allow supplementation of the record. Unfortunately for the plaintiff, he failed to do any of
23  these things.
24 [JS 9].

25  In fact, the ALJ invited plaintiff's counsel to submit additional evidence regarding plaintiff's mental
26 impairment. The ALJ left the record open and continued the hearing once for that purpose as well as to
27 obtain testimony from a medical expert. The ALJ volunteered to assist counsel by issuing a subpoena if
28 counsel let him know one was needed. Thus, plaintiff's counsel had the opportunity and the means to obtain

additional information from Dr. Kohut or other sources regarding the significance of the psychological test results.

Nothing in the record indicates that plaintiff's counsel requested a subpoena. He did not voice any concerns to the ALJ during two administrative hearings about the absence of interpretation of the MMPI-2 test results. When the medical expert, Dr. Kania, testified that he had not interpreted those results but assumed that Dr. Kohut had taken them into account, counsel did not query him further about the significance of the missing evidence. Counsel did not make any arguments to the ALJ regarding the absence of interpretation of the MMPI-2 results.

Plaintiff has not shown that the record as a whole was inadequate or ambiguous to support a disability determination, and neither Dr. Kania nor the ALJ indicated that they considered it so. See Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2006)("The ALJ's duty to supplement a claimant's record is triggered by ambiguous evidence, the ALJ's own finding that the record is inadequate or the ALJ's reliance on an expert's conclusion that the evidence is ambiguous."). Although "the ALJ's affirmative duty to assist a claimant to develop the record . . . complicates the allocation of" the burden of proof, Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999), the ALJ's duty does not relieve plaintiff of her burden to prove disability at steps one through four of the sequential evaluation procedure. See Mayes, 276 F.3d at 459-460 (rejecting the argument that the ALJ breached his duty to develop the record as an impermissible attempt to shift the burden of proving disability away from the claimant).   The ALJ did not err in failing to take steps to develop the record that plaintiff and her attorney declined to pursue when given the opportunity to do so. Accordingly, plaintiff's contention lacks merit.

**Work absences**

Plaintiff contends that the ALJ improperly rejected treating source opinions from Dr. Kohut and Dr. Silverman that plaintiff would have frequent absences from work. [JS 9-11].

In a May 2007 assessment form, treating psychiatrist Dr. Kohut checked boxes indicating that plaintiff would miss 3 or more days of work a month as a result of marked to extreme limitations in her work-related mental functional abilities. [AR 413-414]. In an October 2005 letter, Dr. Silverman, a treating psychologist, stated that before plaintiff stopped working (which occurred in 1998, not in 1997, as Dr. Silverman mistakenly noted), plaintiff "was frequently late for work and often missed work due to her

5

illness." [AR 275, 534-535]

Plaintiff asserts that the ALJ "totally failed to mention" opinions from Dr. Kohut and Dr. Silverman that plaintiff's depression would result in frequent absences from work. That argument misses the mark. First, Dr. Silverman's comment reflected merely what she was told (or what she recalled) about plaintiff's subjective work history. Dr. Silverman ventured no opinion about expected current or future work absences.

Second, and more importantly, the ALJ discussed, and gave reasons for rejecting, the opinions of Dr. Kohut and Dr. Silverman that plaintiff was disabled. Under the well-established treating physician rule, the ALJ may reject a controverted treating or examining source opinion for specific and legitimate reasons that are based on substantial evidence in the record. <u>Batson v. Commissioner of Social Sec. Admin.</u>, 359 F.3d 1190, 1195 (9th Cir. 2004); <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1148-1149 (9th Cir. 2001). Rather than explaining why the ALJ's enumerated reasons are legally erroneous or lack substantial support in the record, plaintiff assails the ALJ for not expressly mentioning an isolated, discrete functional element of those opinions. Because the ALJ is not required to reject a treating source disability opinion on a function-by-function basis, this tactic obliges the defendant to fully brief the question whether the ALJ correctly evaluated the treating source opinion as a whole (a question plaintiff improperly sidestepped) in order adequately to defend the ALJ's decision.[1]

As defendant asserts, the ALJ provided specific, legitimate reasons based on substantial evidence for rejecting the controverted disability opinions of Dr. Kohut and Dr. Silverman. [JS 5-8, 10]. Dr. Silverman submitted letters in October 2005 and September 2007 stating that plaintiff had a diagnosis of major depression, severe. Dr. Silverman said that she treated plaintiff with psychotherapy from December 1996 to September 2002, when plaintiff moved, and then again briefly in 2006. [AR 18-19, 275-277, 510-512]. The ALJ noted that Dr. Silverman said that she had been unable to locate any of plaintiff's treatment records and consequently provided no contemporaneous clinical findings to support her disability opinion. Instead, Dr. Silverman provided a "clinical summary" and disability assessment based solely on her recollections of plaintiff's condition three to five years earlier. [AR 275, 511-512]. The absence of documented clinical findings to support Dr. Silvernman's assessment was a legitimate reason for rejecting

---

[1] The court notes that this approach to briefing issues has been used before in cases before this court filed by attorneys from plaintiff's counsel's law firm.

6

her opinion. See Tonapetyan, 242 F.3d at 1148 ("When confronted with conflicting medical opinions, an ALJ need not accept a treating physician's opinion that is conclusory and . . . unsupported by clinical findings.")(citing Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992)); Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (holding that the ALJ properly rejected a treating physician's opinion that was "conclusory and unsubstantiated by relevant medical documentation").[2]

Additionally, the ALJ permissibly rejected Dr. Silverman's opinion that plaintiff suffered from disabling "medication resistant depression" because it was inconsistent with progress notes through December 2003 from Dr. Kohut and from plaintiff's primary physician, Dr. Fox, which indicated that plaintiff's depression had improved and was reasonably well-controlled with medication and therapy during the relevant period. [AR 19]. See Morgan, 169 F.3d at 603 (stating that "internal inconsistencies within [the treating and examining physicians'] reports, and the inconsistencies between their reports, also constitute relevant evidence" supporting rejection of those physicians' opinions).

The ALJ also rejected Dr. Kohut's disability assessments. In August 2005, more than a year and a half after plaintiff's insured status expired, Dr. Kohut completed a "Short Form Evaluation for Mental Disorders." He noted that plaintiff exhibited signs and symptoms of depression on her *current* mental status examination. He rated her ability to understand, remember, and carry out simple instructions "fair" and her other work-related mental functional abilities "poor." [AR 392-394]. In February 2006, more than two years after plaintiff's insured status expired, Dr. Kohut wrote that plaintiff had diagnoses of major depressive disorder, recurrent, and dependent personality disorder. He did not assess any functional limitations in that letter. [AR 390]. In May 2007, more than three years after plaintiff's insured status expired, Dr. Kohut

---

[2] The record also contains a letter from Dr. Silverman dated March 26, 1997. [AR 276-277]. That letter is inaccurate on its face because it states that Dr. Silverman started seeing plaintiff on May 21, 1997, after the date of the letter. In that letter, Dr. Silverman recounted plaintiff's subjective history and symptoms, but she did not describe any clinical findings. Dr. Silverman concluded that plaintiff 'has recently begun to experience some relief from her depression" as a result of medication and therapy, but that she continued to have "problems with concentration and focus" along with complaints of fatigue and joint pain. Dr. Silverman acknowledged that plaintiff had "shown improvement over the last few months," but she added that plaintiff "continues to suffer from sufficient physical and emotional problems that prevent her form being able to return to work full-time." [AR 277].

completed a "Work Capacity Evaluation (Mental)" checklist form indicating that plaintiff had "marked" or "extreme" mental functional limitations and would miss 3 or more days a month of work. [AR 413-414].

Based on the documentary evidence and Dr. Kania's testimony, the ALJ reasoned that Dr. Kohut's disability opinions were not consistent with the medical evidence as a whole through plaintiff's date last insured, December 31, 2003. [AR 18-20]. The ALJ observed that Dr. Kohut initially saw plaintiff in 1998, but Dr. Kohut's progress notes, as well as those of Dr. Fox, plaintiff's primary care doctor, indicate that her symptoms responded well to medication. [AR 19, 317-318, 508-509]. Dr. Kohut saw plaintiff for medication monitoring only four times in 1999, and her condition was noted to be stable. [AR 19, 475, 507]. Progress notes from Dr. Kohut and Dr. Fox prior to December 31, 2003 indicate that with medication and therapy, plaintiff's depression was reasonably well controlled [e.g., AR 301], and that occasional episodes of symptom exacerbation, medication side effects, or adverse medication interactions were managed by adjusting her medication regimen and continuing therapy. [See AR 19, 260-273, 295-317, 472-475, 504-509; see also AR 544-545]. The ALJ remarked that plaintiff voluntarily discontinued her psychiatric medication in July 2000 because she wished to get pregnant. [AR 19, 474, 506]. She testified that she resumed her medication in January 2001 while pregnant because she was "suicidal." [AR 544]. Dr. Kohut's notes indicate that she restarted Wellbutrin due to depression in February 2001, but his notes say nothing about suicidal ideation. [AR 19, 474, 506]. During her next visit in June 2001, plaintiff's condition was improved. [AR 19, 474, 544]. Plaintiff had an exacerbation in symptoms in November 2001, and Dr. Kohut saw her on an emergency basis for adjustment of her medications. [AR 473, 505]. Dr. Kohut saw plaintiff only twice in 2002. [AR 505]. During her August 2002 visit, he noted that plaintiff was experiencing "considerable turmoil" in her marriage, and she was admonished to continue with medications and therapy. Progress notes from 2002 and 2003 indicate that plaintiff's condition was "somewhat improved," and "relatively stable." [AR 19, 472-474, 504-505]. Nowhere in his contemporaneous treatment records does Dr. Kohut indicate that plaintiff was disabled before December 31, 2003.

In addition to Dr. Kohut's treating notes, the ALJ relied on the medical expert's testimony, which he described as follows:

> Dr. Kania testified that the claimant's depression has responded to Wellbutrin and she was
> seen only intermittently by Dr. Kohut. While Dr. Silverman asserted that the claimant has

a GAF score of 45 [indicating serious symptoms or a serious impairment], her assessment was recently written, based on no records and on recollection only. In fact, under doctor supervision, the claimant stopped all medication to become pregnant in 2001. Moreover, records from Dr. Kohut show no severe condition and that psychotropic medications were effective when taken. Dr. Kania also commented on Dr. Kohut's assertions regarding the severity of the claimant's condition and testified that there was nothing in his notes to support his assertions.

[AR 20; see AR 536-543]].

The ALJ articulated specific, legitimate reasons, based on substantial evidence in the record, to support his evaluation of the opinions of Drs. Kohut and Silverman with respect to the period ending on December 31, 2003. Therefore, plaintiff's contention that the ALJ erred in evaluating their opinions regarding plaintiff's work absences is unmeritorious.

**Dr. Kohut's August 2005 evaluation**

Plaintiff contends that the ALJ did not provide legally sufficient reasons for rejecting Dr. Kohut's August 30, 2005 "Short Form Evaluation for Mental Disorders." [JS 11-12].

For the reasons explained above, the ALJ did not err in rejecting Dr. Kohut's disability opinions with respect to the period before plaintiff's insured status expired, including his August 2005 assessment.

**Lay witness testimony**

Plaintiff contends that the ALJ committed legal error by misrepresenting, and failing properly to consider, the lay witness testimony presented by plaintiff's husband, Kevin T. Harlow. [JS 12-17].

While an ALJ must take into account lay witness testimony about a claimant's symptoms, the ALJ may discount that testimony by providing "reasons that are germane to each witness." Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)(quoting Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir.1993)); see Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1163-1164 (9th Cir. 2008)(holding that the ALJ did not err in rejecting a lay witness's testimony that the claimant often appeared uncomfortable in class and sometimes appeared confused because that testimony was inconsistent with the claimant's successful completion full-time course work). Germane reasons for rejecting a lay witness's testimony included inconsistencies between that testimony and the medical evidence, inconsistencies between that testimony

and the claimant's presentation to treating physicians during the period at issue, and the claimant's failure to participate in prescribed treatment. See Greger, 464 F.3d at 971; Bayliss, 427 F.3d at 1218.

The ALJ discussed plaintiff's husband's testimony. [AR 21, 165-172]. The ALJ remarked that although plaintiff "testified to having significant functional limitations," her statements documented elsewhere in the record and her husband's statements suggest that prior to her date last insured, "she was actually quite active. Indeed, these statements show that the claimant did all household chores including laundry, cooking, vacuuming, dusting, shopping, taking care of her two children," the younger of whom was a baby and the older of whom was a young child during most of the relevant period. [AR 21]. The ALJ noted that during the relevant period, plaintiff attended church weekly and regularly participated in a Bible study group. Plaintiff testified that she began home-schooling her children in 2004 (after her insured status expired, but during her alleged period of disability) for reasons unrelated to her impairments and continued to do so through the date of the hearing in 2007. She said that she had some good times and some "really bad times, and for the most part I just get by." [AR 550].

Mr. Harlow indicated (in August 2005) that plaintiff could no longer ride and race bicycles, take long, vigorous walks, or go white-water rafting. [AR 166]. He said that she sometimes stayed in her pajamas all day or went days without bathing. He observed that she had become "slightly reclusive and is embarrassed to have old friends see her," and therefore avoided them. [AR 170]. He also said that plaintiff needed a lot of sleep and had difficulty waking and getting up. [AR 166]. As the ALJ noted, however, Dr. Fox attributed some of plaintiff's complaints of inadequate sleep in 2002 to a "lifestyle choice," noting that she "goes to bed late, wakes up early with her daughter[,] and the quality of sleep she is getting is not so great either since she does have an infant at home." [AR 17-18, 301].

Mr. Harlow indicated that despite plaintiff's subjective "pain throughout her body" [AR 172], fatigue, and the limitations he described, plaintiff managed to perform a variety of daily activities, including caring for their young children (and, as plaintiff testified, home-schooling them by that time), doing laundry and dishes several times a week, vacuuming and dusting twice a month, preparing simple meals one to four times daily, driving, shopping for groceries, school supplies, and clothing about twice a week for two to three hours at a time, paying bills, handling money, scrapbooking once or twice a month, e-mailing friends, attending church regularly, and visiting friends or taking their children to the bowling alley one to three

10

times a week. [AR 165-170]. He said that he had observed "unusual behavior" by plaintiff in the form of "uncontrollable crying, isolation, and inability to communicate at all," but that "[t]his stopped as her doctor prescribed anti-depressant medications." [AR 171].

The ALJ did not misrepresent Mr. Harlow's testimony by citing portions of it that he permissibly deemed inconsistent with plaintiff's subjective allegations of a total disability prior to her date last insured. Regarding Mr. Harlow's testimony as a whole, the ALJ stated that it was not "sufficiently credible to warrant the assessment of limitations more restrictive" than the ALJ imposed in light of "all the medical evidence, written statements, and the testimony presented at the hearing. . . ." [AR 21]. The ALJ satisfied his burden to articulate germane reasons for his assessment of the credibility of Mr. Harlow's statements.[3]

**Side effects of medications**

Plaintiff argues that the ALJ failed properly to consider plaintiff's written disability report stating that she suffered side effects of headaches, sleepiness, anxiety, abdominal cramps, and diarrhea from taking the medications Wellbutrin, Lexapro, Provigil, Eozortrin, and Ibuprofen. [JS 16-17].

Contrary to plaintiff's argument, the ALJ acknowledged that plaintiff had side effects that "contributed somewhat to her symptoms," but "this has been generously considered within the delineated" RFC limiting plaintiff to simple, repetitive tasks. [AR 16, 19, 21]. The record indicates that prior to her date last insured, plaintiff told Dr. Fox about some side effects or interactions from her use of atenolol, Sudafed, and Elavil. Those medications were promptly discontinued. [See, e.g., AR 19, 301, 309]. The two anti-depressants she was prescribed consistently for a protracted period before her date last insured were Wellbutrin SR and Buspar (which she stopped taking in 2004 due to weight gain). Effexor and Topamax were briefly attempted and discontinued during the relevant period. [AR 465-476, 498-509].

Plaintiff has not pointed to any evidence in the record documenting complaints to her doctors of the side effects she attributed in her disability report to Wellbutrin SR (headaches and high blood pressure). [AR 176]. See Miller v. Heckler, 770 F.2d 845, 849 (9th Cir. 1985) (holding that the ALJ properly rejected

---

[3] Aside from arguing that the ALJ failed adequately to consider medication side effects, plaintiff has not challenged the ALJ's assessment of the credibility of her own testimony. Insofar as Mr. Harlow's testimony merely repeats plaintiff's subjective complaints of pain and fatigue (rather than stating his personal observations) or is cumulative, the reasons given by the ALJ for rejecting plaintiff's subjective complaints also would be germane to Mr. Harlow's testimony.

allegations of impairment from side effects of narcotic medication because the plaintiff produced no clinical evidence showing that narcotics use impaired his ability to work). During the hearing, plaintiff mentioned the problem she had experienced with atenolol before its discontinuance. [AR 545]. She also said that Dr. Kohut had added a "serotonin medication" (Cymbalta) to her regimen along with Wellbutrin, but that she took "only a low dose because it makes me tired. . . ." [AR 545-546].

Plaintiff's long-term use of Wellbutrin SR and Buspar without medical documentation of significant side effects before December 31, 2003 indicates that any side-effects she did experience were not disabling. The ALJ rationally inferred that plaintiff's use of psychiatric medications limited her to simple, repetitive tasks but did not prevent her from working altogether before expiration of her insured status.

## Conclusion

For the reasons described above, the Commissioner's decision is supported by substantial evidence in the record and is free of legal error. Therefore, the Commissioner's decision is **affirmed.**

**IT IS SO ORDERED.**

DATED: October 20, 2008

_____
ANDREW J. WISTRICH
United States Magistrate Judge